UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>REAL PROPERTY KNOWN AND NUMBERED AS 5445 COLLINS AVENUE, UNIT CU-19, MIAMI BEACH, MIAMI-DADE COUNTY, FLORIDA 33140, WITH ALL APPURTANCES, IMPROVEMENTS AND ATTACHMENTS THEREON,<br><br>    Defendant 1,<br><br>and<br><br>REAL PROPERTY KNOWN AND NUMBERED AS 5601 COLLINS AVENUE, UNIT M-10, MIAMI BEACH, MIAMI-DADE COUNTY, FLORIDA 33140, WITH ALL APPURTANCES, IMPROVEMENTS AND ATTACHMENTS THEREON,<br><br>    Defendant 2,<br><br>and<br><br>REAL PROPERTY KNOWN AND NUMBERED AS 5601 COLLINS AVENUE, UNIT CU-7B, MIAMI BEACH, MIAMI-DADE COUNTY, FLORIDA 33140, WITH ALL APPURTANCES, IMPROVEMENTS AND ATTACHMENTS THEREON,<br><br>    Defendant 3. | CASE NO.: 1:14-cv-667<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff, United States of America, by and through the undersigned United States Attorney for the Southern District of Ohio, alleges the following upon information and belief for its action against the defendants in accordance with Supplemental Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, 28 U.S.C. App. ("Supplemental Rules") and the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture to the United States of:

> Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

and/or § 981(a)(1)(C), which provides for the forfeiture to the United States of:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

## THE DEFENDANTS *IN REM*

2. Defendant 1 is real property known and numbered as 5445 Collins Avenue, Unit CU-19, Miami Beach, Miami-Dade County, Florida 33140 with all appurtenances, improvements and attachments thereon, and is further described as follows:

> CONDOMINIUM UNIT NO. CU19, OF CASTLE BEACH CLUB, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM THEREOF, AS RECORDED IN OFFICIAL RECORDS BOOK 15285, PAGE 1869, AN ANY AMENDMENTS THERETO, IF ANY, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON AREAS, IF ANY.

>ALSO KNOWN AS 5445 COLLINS AVENUE, UNIT CU-19, MIAMI BEACH, FL 33140.
>
>FOLIO NO. 02-3214-021-5580

Defendant 1 is also commonly known as the Riki Tiki Bar and Grill and is located poolside at the Castle Beach Club Condominium, Miami Beach, Florida. The recorded owner of Defendant 1 is Ricardo Jurado.

3. Defendant 2 is real property known and numbered as 5601 Collins Avenue, Unit M-10, Miami Beach, Miami-Dade County, Florida 33140 with all appurtenances, improvements and attachments thereon, and is further described as follows:

>UNIT NO. M-10 OF THE PAVILLION, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM RECORDED IN OFFICIAL RECORDS BOOK 16366, AT PAGE 389, AND ALL EXHIBITS AND AMENDMENTS THEREOF, PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.
>
>PARCEL IDENTIFICATION NUMBER: 02-3211-062-3480

The recorded owner of Defendant 2 is RICVAN LLC.

4. Defendant 3 is real property known and numbered as 5601 Collins Avenue, Unit CU-7B, Miami Beach, Miami-Dade County, Florida 33140 with all appurtenances, improvements and attachments thereon, and is further described as follows:

>UNIT CU-7B, OF THE PAVILION, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM THEREOF RECORDED IN OFFICIAL RECORDS BOOK 16366, PAGE 389, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, AND ALL AMENDMENTS THERETO, TOGETHER WITH ITS UNDIVIDED INTEREST SHARE IN THE COMMON ELEMENTS.
>
>FOLIO NUMBER: 02-3211-062-3580

The recorded owner of Defendant 3 is Ricardo Alfredo Jurado.

## JURISDICTION AND VENUE

5. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. § 981(a)(1)(A) and/or 18 U.S.C. § 981(a)(1)(C).

6. Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

7. The United States does not request authority from the Court to seize the defendants at this time. The United States will, as provided by 18 U.S.C. § 985(b) and (c)(1):

> a. post notice of this action and a copy of the Complaint on each Defendant; and
>
> b. send notice of this action to any person or entity who may claim an interest in the defendants of the United States' forfeiture action against the Defendants, along with a copy of this complaint; and
>
> c. execute a writ of entry for purposes of conducting an inspection and appraisal of the Defendants; and
>
> d. file a lis pendens on each Defendant as notice in county records of each Defendant's status as a defendant in this *in rem* action.

8. Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the Defendants, it is not necessary for the Court to issue an arrest warrant in rem or take any other action to establish *in rem* jurisdiction over the Defendants. Title 18 U.S.C. § 985(b)(2) clearly states that "the filing of a lis pendens and the execution of a writ of entry for the purpose of conducting an inspection and inventory of the property shall not be considered a seizure under this subsection."

## BASES FOR FORFEITURE

9. The defendants are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because the defendants constitute property involved a transaction or an attempted transaction in violation of 18 U.S.C. § 1957 and/or 18 U.S.C. § 1956(a)(1)(B)(i) or are property traceable to such property.

10. The defendants are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because the defendants constitute or are derived from proceeds traceable to one or more violations of the Prescription Drug Marketing Act of 1987, incorporated into the Food, Drug & Cosmetic Act, 21 U.S.C. § 331(t) ("PDMA"), and/or to one or more violations of 18 U.S.C. § 1341 (mail fraud) and/or § 1343 (wire fraud), or a conspiracy to commit such offenses.

11. The specific details of the facts and circumstances supporting the forfeiture of the defendants are contained in the Declaration of Special Agent Kevin J. Bereda of the United States Food and Drug Administration, filed under seal, which is attached as Exhibit 1 and fully incorporated herein by reference.[1]

12. The United States Food and Drug Administration and the United States Postal Inspection Service are conducting a joint investigation regarding Ricardo Alberto Jurado ("Jurado") for various offenses related to the operation of a prescription drug diversion scheme in the Southern District of Ohio and elsewhere.

13. Evidence gathered during the investigation indicates that Jurado, acting alone

---

[1] The United States has filed a Motion to Seal the Declaration of Special Agent Kevin J. Bereda because a related criminal investigation is ongoing. The premature disclosure of information contained in the Declaration may jeopardize the ongoing related criminal investigation and the identity of unindicted co-conspirators, confidential informants, and/or cooperating witnesses. Throughout this Complaint, the United States has used identifiers for various individuals and companies to correlate with the identities disclosed in the Declaration.

and/or in concert with others, conspired to acquire, sell, deliver, and distribute diverted prescription drugs in violation of 21 U.S.C. § 331(t), which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(F) as defined by 18 U.S.C. § 24(a)(2).

14. Jurado also committed and/or conspired to commit mail and/or wire fraud by actively and intentionally engaging in the drug diversion scheme detailed in this Complaint. The drug diversion scheme constituted a scheme or artifice to defraud, and Jurado and his co-conspirators made use of the mail and interstate wire communications to further their fraud scheme. Jurado and his co-conspirators engaged in the fraud scheme with the intent to deprive their victims of money and/or other property.

15. Jurado's acts of mail and wire fraud include, but are not limited to, causing the diverted drugs to be transported by common carrier in interstate transportation and receiving payment for such diversions by wire transfer in violation of the mail fraud and wire fraud statutes, 18 U.S.C. § 1341 and § 1343.

16. Jurado also used the mail and wire fraud proceeds (both of which are specified unlawful activities as defined by 18 U.S.C. § 1956(c)(7)) to conduct financial or monetary transactions in amounts over $10,000.00 in violation of 18 U.S.C. § 1957 and/or to conceal or disguise the nature, location, source, ownership, or control of the proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

17. The Food and Drug Administration ("FDA") is an agency within the U.S. Department of Health and Human Services responsible for protecting the public health by assuring the safety, effectiveness, and security of human and veterinary drugs.

18. Congress enacted the Prescription Drug Marketing Act of 1987, incorporated into the Food, Drug & Cosmetic Act, 21 U.S.C. § 331(t) ("PDMA") to combat a practice known as

prescription drug diversion. In essence, diverted prescription drugs are those that have been removed from the regulated distribution channels but are then reintroduced into the wholesale marketplace through various means, including the falsification of the accompanying pedigrees. Once a prescription drug is diverted outside of the regulated distribution channels, it becomes difficult, if not impossible, for regulators, such as the FDA, law enforcement officers, or the end-users of the drugs to know whether the prescription drug package contains the correct drug or the correct dose. Regulators, law enforcement, and end users do not know whether the prescription drug was altered, stored in improper conditions, or adversely affected in its potency.

19. The PDMA requires wholesale distributors to provide a document, commonly referred to as a "pedigree," with each wholesale distribution of a prescription drug, and prohibits any alteration or modification of the pedigree. 21 U.S.C. § 353(e)(1). The pedigree is required to list all previous sales of the prescription drug back to the authorized distributor of record. Requiring such an affirmative disclosure discourages the introduction of diverted prescription drugs purchased from illegitimate sources like unlicensed wholesalers, and prohibits resale from closed-door pharmacies, street diverters, drug counterfeiters, and thieves. Separate and apart from the federal requirement, many states also require that wholesalers provide pedigrees with each wholesale distribution.

20. The PDMA was enacted (1) to ensure that drug products purchased by consumers are safe and effective, and (2) to avoid the unacceptable risk to American consumers from counterfeit, adulterated, misbranded, sub potent, or expired drugs. The legislation was necessary to increase safeguards in the drug distribution system to prevent the introduction and retail sale of substandard, ineffective, or counterfeit drugs.

21. Drug diverters use a number of different methods to obtain prescription drugs at discounted prices and reintroduce them at higher prices. In a practice known as street diversion, diverters repurchase dispensed medications from Medicaid patients, remove the patient labels, and reintroduce the medications into the wholesale market. Another common form of diversion, using closed-door pharmacies that are not open to the public, involves the unauthorized resale of drugs that manufacturers sell at steep discounts to non-profits like hospitals or healthcare entities. An additional form of diversion entails relabeling expired drugs with counterfeit labels so that they can be reintroduced into the wholesale market. Some drug diversion involves the reintroduction of stolen prescription drugs into the wholesale distribution chain.

22. The aim of prescription drug diversion is to unlawfully acquire drugs and reintroduce them into the wholesale market in a manner that obscures the fact that the drugs were ever diverted. When done effectively, neither the pharmacist nor the consumer knows that the diverted drugs were previously handled, packaged, and labeled by parties not authorized or qualified to do so.

23. Since at least 2007 and continuing until at least March 2014, Jurado and others conspired to acquire diverted prescription drugs and deliver them to co-conspirators including one or more individuals conducting business as a pharmaceutical wholesaler (hereafter referred to as "the Wholesaler"). The pharmaceutical wholesalers, including the Wholesaler, sell drugs nationally, including to customers (such as pharmacies and other distributors) in the Southern District of Ohio. The diverted drugs are eventually sold to individuals in the Southern District of Ohio and elsewhere, and payment for the diverted drugs is made, in whole or in part, by public and private health care benefit programs, including Medicare, Medicaid, and private contracts and

plans of health insurance.

24. Jurado advanced the illegal drug diversion scheme by supplying and selling illegally diverted prescription drugs to the Wholesaler for resale to end users, engaging in money laundering activities, lying to federal agents in order to avoid detection by law enforcement.

25. The drug diversion scheme began in approximately 2007 and continued until at least March 2014. From on or about July 1, 2008, until on or about August 31, 2012, the Wholesaler's[2] records indicate that approximately $2,871,309.09 in diverted drugs were sold by the Wholesaler to nine pharmacies located in the Southern District of Ohio. Of the approximately three hundred twenty-three (323) transactions that occurred during that time frame in the Southern District of Ohio, Distributor 1 and Distributor 2, both of which were associated with Jurado (as described below), were listed as two of the largest suppliers of diverted drugs to the Wholesaler.

26. Jurado unlawfully and systematically obtained diverted prescription drugs from various sources and sold them to the Wholesaler. At no time did Jurado have a license to distribute prescription drugs in any state.

27. Once Jurado aggregated enough diverted drugs, he sent the drugs to the Wholesaler via common carrier. The Wholesaler then paid Jurado via wire transfer for the drugs either directly by wire transfer or via wire transfer to co-conspirators and other companies. The Wholesaler then reintroduced the drugs into the stream of commerce to other drug wholesalers or to independent pharmacies across the country. Fraudulent pedigree documents were provided to these purchasers via a web page set up by the Wholesaler's company, which did not disclose the true source of the drugs sold to the customers and which falsely represented that other authorized

---

[2] The Wholesaler and other entities and/or individuals not identified by name in this Complaint are identified in the Declaration of Special Agent Kevin J. Bereda, which the United States has sought to be sealed in this matter.

distributors provided the drugs to the Wholesaler.

28. Jurado and the Wholesaler's other prescription drug sources are not legitimate sources, e.g., they are not licensed wholesalers and/or they do not provide the required pedigree documents identifying each prior seller of the drugs back to the manufacturer or an authorized distributor.

29. Jurado did not provide pedigree documents with any of his many drug shipments.

30. To further the drug diversion scheme, on numerous occasions, Jurado faxed the Wholesaler, through an intermediary, a listing of available diverted prescription drugs for sale. The Wholesaler responded by indicating the drugs it wished to purchase. Jurado used a company name in his fax offers of drugs for sale. This company name was also used in documents created by the Wholesaler in connection with the purchases and from payments to Jurado. Corporation records for the State of Florida indicate that this company was incorporated by another individual on March 7, 2008, and was dissolved several months later on September 25, 2008. This company was not licensed as a prescription drug wholesaler in the State of Florida.

31. In 2012, after federal agents served Jurado's intermediary with a subpoena, he withdrew from the diversion scheme. The Wholesaler then placed his long-time employee in charge of coordinating the receipt of diverted prescription drugs from Jurado. Jurado communicated with this longtime employee by prepaid cellular phone (commonly known as a "burner" phone).

32. Jurado caused the drugs to be shipped to the Wholesaler's warehouse in Minnesota or to Distributor 2 in Puerto Rico. The drugs shipped to Distributor 2 were then shipped to the Wholesaler's warehouse in Minnesota.

33. Throughout this entire process, over many years and many millions of dollars in

diverted prescription drugs, the Wholesaler used one of two Puerto Rico companies, Distributor 1 or Distributor 2, on pedigrees for the diverted prescription drugs he sold to other wholesalers or to independent pharmacies. Jurado sold millions of dollars in diverted prescription drugs to the Wholesaler, who then sold the drugs using false pedigrees identifying Distributor 1 or Distributor 2 as the source of the drugs and identifying Distributor 1 or Distributor 2 as an authorized distributor. In fact, Distributor 1 and Distributor 2 were not the source of the drugs and neither company was an authorized distributor for any of the prescription drugs sold.

34. Based on a review of banking records for Jurado, others, and their related companies, Jurado has conducted dozens of transactions with the Wholesaler's companies resulting in millions of dollars being deposited into various companies and to real estate attorneys' accounts at the direction of Jurado.

35. Specifically, evidence gathered during the investigation indicates that Jurado sold at least $20,269,977 in diverted prescription drugs to the Wholesaler. The Wholesaler, in turn, sold approximately $2,871,309.09 in diverted prescription drugs in the Southern District of Ohio.

36. Jurado or his employees or other conspirators instructed the Wholesaler to make payments for the diverted drugs at several bank accounts that shifted at regular intervals. Specifically, Jurado instructed the Wholesaler to make payments to a rotating array of approximately 12 companies with bank accounts located in the United States, Nicaragua and Mexico.

37. Jurado also directed the Wholesaler to pay him for the diverted drugs by making payments to real estate attorneys. Jurado then used those payments for the purchase of properties. Defendants were purchased in that manner with proceeds from the mail and wire fraud scheme involving the sale of diverted prescription drugs.

38. The Wholesaler initially paid Jurado for diverted drugs directly from one of his company bank accounts; however, beginning in 2011, the Wholesaler paid Jurado directly from a bank account the Wholesaler opened in the name of Distributor 2. The Wholesaler later shifted to paying Jurado first by wiring money to another bank account in the name of Distributor 2, and then having a co-conspirator wire the money from that account to Jurado.

39. Use of interstate wire communications in furtherance of the scheme includes wire transfers for payment and the transmission of false pedigrees via the Wholesaler's website. Use of the U.S. Mails in furtherance of this scheme includes shipment of drugs by Jurado to the Wholesaler and from the Wholesaler to the Wholesaler's customers via common carrier.

40. On or about October 5, 2012, Jurado used proceeds of the illegal drug diversion scheme to purchase Defendant 1. On or about September 25, 2012, the Wholesaler transferred $529,010.50 through an account in the name of Distributor 2 to a real estate attorney. Jurado directly or indirectly informed the attorney that the wire transfer was to purchase Defendant 1. On or about October 5, 2012, at the direction of Jurado, the real estate attorney wired $513,268.85 to the seller of Defendant 1. Jurado is listed as the owner or borrower on the HUD statement, the warranty deed, and the title insurance policy for Defendant 1.

41. On or about March 21, 2014, Jurado used proceeds of the illegal drug diversion scheme to purchase Defendant 2 under the name of his company Ricvan LLC. On or about January 10, 2014, an employee of Distributor 2 sent a wire transfer in the amount of $90,000.00 to a real estate attorney. The payment from Distributor 2 to the real estate attorney represented a payment for diverted drugs provided by Jurado. Jurado directly or indirectly informed the attorney that the wire transfer was to purchase Defendant 2. On or about January 31, 2014, the seller of Defendant 2, received the balance of the purchase price of Defendant 2 via an official

bank check for $188,030.00, purchased by the same Distributor 2 employee who initiated the original wire transfer, and using funds from the Distributor 2 bank account. Jurado directly or indirectly informed the seller that the check was for the purchase of Defendant 2. Jurado purchased Defendant 2 under the name of his company Ricvan LLC and signed the HUD statement as "member manager." On the Warranty Deed for the purchase of Defendant 2, Ricvan LLC's address is the same as Jurado's home address.

42. On or about September 16, 2013, Jurado used proceeds of the illegal drug diversion scheme to purchase Defendant 3. On or about August 12, 2013, Jurado drafted a personal check in the amount of $10,000.00 to a real estate attorney as a down payment for the purchase of Defendant 3. On or about September 25, 2013, Distributor 2 sent a wire transfer in the amount of $94,500.00 to the real estate attorney. The payment from Distributor 2 to the real estate attorney represented a payment for diverted drugs provided by Jurado. Jurado directly or indirectly informed the sellers of Defendant 3 that the check was for the purchase of Defendant 3. Jurado is listed as the borrower on the HUD statement and owner on the warranty deed for Defendant 3.

43. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the United States will be able to meet its burden of proof at trial. Specifically, the United States has set forth facts that support a reasonable belief that the United States will be able to show by a preponderance of the evidence that the defendants are property involved in money laundering and/or are the proceeds of violations of the PDMA and/or mail fraud and wire fraud or conspiracy to commit such offenses.

### CLAIM FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that:

(a.) the Court find there is probable cause to believe that the defendants have been

forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and/or 18 U.S.C. § 981(a)(1)(C);

(b.)  pursuant to 18 U.S.C. § 985(b)(2) and 18 U.S.C. § 983(j), which permits the Court to "take any . . . action to . . . preserve the availability of the property subject to civil forfeiture," the Court issue the proposed Writ of Entry authorizing the United States Marshals Service or its delegate, to enter the Defendants, including any structures, on one or more occasions during the pendency of this *in rem* forfeiture action:

>   1. for the purpose of conducting an inspection and inventory and appraisal of the Defendants, which inspection and inventory and appraisal may include still and video photography;
>
>   2. to be accompanied on any such occasion by any appraiser(s) selected by it to appraise the condition and value of the Defendants pursuant to 19 U.S.C. § 1606;
>
>   3. to be accompanied on any such occasion by any government or contract personnel selected by it for the purpose of conducting an inventory of the Defendants; and
>
>   4. to be accompanied on any such occasion by any federal, state and local law enforcement officers selected by it to ensure the safety of any person acting under the Writ of Entry;

(c.)  the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendant property to assert in conformity with the law a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov for 30 consecutive days;

(d.)  the forfeiture of the defendant property to the United States be confirmed, enforced, and ordered by the Court;

(e.)  the Court thereafter order the United States to dispose of the defendant property as provided by law; and

  (f.)  the Court award plaintiff all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

s/ Matthew J. Horwitz
MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
513-684-3711 (fax) 513-684-6972
Matthew.Horwitz@usdoj.gov

## VERIFICATION

I, Special Agent Kevin J. Bereda, hereby verify and declare under the penalty of perjury that I am a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations, that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except those matters herein stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

Dated: August 19, 2014

_____
Kevin J. Bereda
Special Agent, U.S. Food and Drug Administration,
Office of Criminal Investigations